Michael B. Kramer (MK 7071)
Artemis Croussouloudis (AC 9953)
MICHAEL B. KRAMER & ASSOCIATES
488 Madison Avenue, 11th Fl.
New York, New York 10022
(212) 319-0304
mkramer@mkramerlaw.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

ABKCO MUSIC & RECORDS, INC.,
ABKCO MUSIC, INC., UMG RECORDINGS,
INC., UNIVERSAL - SONGS OF POLYGRAM
INTERNATIONAL INC., POLYGRAM
PUBLISHING, INC., SONGS OF UNIVERSAL, INC.,
UNIVERSAL MUSIC CORP., and
CAPITOL RECORDS, LLC,

Case No.: 19-cv-11892

                                    Plaintiffs,

                v.

CODA PUBLISHING, LTD., ROBERT KIRK
CARRUTHERS, CLARE ANNE GAMBOLD,
GWILYM MICHAEL DAVIES, and VISION
FILMS, INC.,

                                    Defendants.
------------------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DAUBERT MOTION

MICHAEL B. KRAMER & ASSOCIATES
488 Madison Avenue, Suite 1120
New York, New York 10022
Phone: 212-319-0304
Email: mkramer@mkramerlaw.com
Email: artemis@mkramerlaw.com
*Attorneys for Plaintiffs ABKCO Music & Records,
Inc., ABKCO Music, Inc., UMG Recordings, Inc.,
UNIVERSAL - Songs of Polygram International
Inc., POLYGRAM Publishing, Inc., Songs of
Universal, Inc., UNIVERSAL Music Corp., and
CAPITOL Records, LLC*

# TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES ....................................................................................ii

I. PRELIMINARY STATEMENT...........................................................................1
II. STATEMENT OF FACTS…………………………………………………………2
      A.     The Plaintiffs…………………………………………………………3
            Defendants and their Actions………………………………………………4
            A.     The Vision/Coda 2012 Agreement………………………………………5
            B.     The 2017 Vision Agreements……………………………………………5
            The Dispute…………………………………………………………6
III. ARGUMENT….,……………………………………………………………8
     A. Legal Standards……………………………………………………8
     B. Defendants' Use of the Infringed Works Is Not Fair Use…………………10
          1.     The Purpose and Character of Defendants' Uses……………………......11
               i. Defendants' Uses are Exclusively Commercial………….. …………11
               ii. Defendants' Use of the Infringed Works Is Not Transformative……..13
               iii. Defendants' Uses Were In Bad Faith…………………………….....14
          2.     The Nature of the Infringed Works …………………………….....…...16
          3.     The Amount and Substantiality of the Use………………………….…16
          4.     The Effect of Defendants' Use on Plaintiffs' Potential Market…………18
     C. Defendants' Infringement Was Willful……………………………………20
     D. Carruthers and Davies Are Individually Liable for the Infringing Conduct of Coda...24
     E. Plaintiffs Are Entitled to a Permanent Injunction Enjoining Defendants from
        Continuing to Infringe Plaintiffs' Infringed Works or Plaintiffs' Musical
        Copyrights, Sound Recordings or Films……………………………………26
     F. The Plaintiff's Daubert Motion Should Be Granted……………………:…………30
IV.    Conclusion…………………………………………………………………34

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*10 Ellicott Square Court Corp. v. Mt. Valley Indem. Co., 634 F.3d 112,*
634 F.3d 112, 114, 2010 U.S. App. LEXIS 26035, *1, 2010 WL 52954207.....................8

*Ricci v. DeStefano*, 557 U.S. 557, 586 (2009

*Lue v. JPMorgan Chase & Co.,*
768 Fed. Appx. 7, 2019 U.S. App. LEXIS 12558, 2019 WL 1785491.............................8

*Alexander v. Bd. of Educ.,*
648 Fed. Appx. 118, 2016 U.S. App. LEXIS 83817.................................................8

*Ashley v. City of New York,*
2017 U.S. Dist. LEXIS 107980, 2017 WL 2972145.................................................8

*Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.,*
602 F.3d 57, 2010 U.S. App. LEXIS 7141, 94 U.S.P.Q.2D (BNA) 1354, Copy. L. Rep. (CCH)
P29,903...................................................................................................9

*Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 589 (1993)..............................9

*Rogers v. Raymark Indus.,* Inc., 922 F.2d 1426, 1430 (9th Cir. 1991)
(citing *McGlinchy v. Shell Chem. Co.,* 845 F.2d 802, 806 (9th Cir. 1988).....................9

*U.S. Securities & Exchange Com'n v. Jensen,* 835 F.3d 1100, (9th Cir. 2016)............9, 10

*US v. Ramirez-Robles,* 386 F. 3d 1234, 1243 (9th19 Cir. 2004)..............................10

*Elsayed Mukhtar v. Cal. State Univ. Hayward,* 299 F.3d 1053, 1063 (9th Cir. 2002)...10

*Murray v. Southern Route Maritime SA,* 870 F. 3d 915, 923 (9th Cir 2017)...............10

*Stern v. Lavender.,*
319 F. Supp. 3d 650, 2018 U.S. Dist. LEXIS 121405..............................................10

*Harper & Row Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539, 549 (1985)..............10

*Elvis Presley Enters., Inc. v. Passport Video,* 349 F.3d 622 (9th Cir. 2003)......11, 13 14, 16, 17

*Andy Warhol Found for the Visual Arts v. Goldsmith,* 2021 U.S. App. LEXIS 25277, ___ F.
4th___, 2021 WL 3742835........................................................................11, 31

*Campbell v. Acuff Rose Music, Inc.,* 510 U.S.569 (1994)............................. 11, 13, 14, 17
*KCAL-TV,* 108 F.3d 1119 (9th Cir.1997 ..................................................11, 13, 15, 16

*Threshold Media Corp. v. Relativity Media, LLC,*
66 F.Supp.3d 1011 (C.D. Cal. Mar. 19, 2013)........................................................11, 17

*American Geophysical Union v. Texaco Inc.,*
1994 U.S. App. LEXIS 36735....................................................................................11

*Oracle America, Inc. v. Google LLC,* 886 F.3d 1179, 1196 (Fed. Cir. 2018)..........11,13, 14,15,
16,17,19

*Lombardo v. Dr. Seuss Enters., L.P.,* 729 Fed. Appx. 131, (2d Cir 2018)...........................17

*Hofheinz v. AMC Productions, Inc.,* 147 F. Supp. 2d 127, 139 (E.D.N.Y. 2001)..............17,18

*Fox Broad. Co. v. Dish Network L.L.C.,*
747 F.3d 1060, 1069 (9th Cir. 2014) (quoting *Harper & Row,* 471 U.S. at 566))..................19

*Infinity Broad. Corp. v. Kirkwood,* 150 F.3d 104, (2d Cir.1998)....................................19

*Island Software & Computer Serv. v. Microsoft Corp.,* 413 F. 3d 257 (2nd Cir. 2005)............20

*Knit Waves, Inc. v. Lollytogs Ltd.,* 71 Fed.3d 996, 1010 (2nd Cir. 1995) ......................20, 21

*NAS Import Corp. v. Chenson Enters., Inc.,*
968 Fed.2d 250, 252 (2nd Cir. 1992))...................................................................21

*Lipton Nature Co.,* 71 Fed. 3d 464, 472 (2nd Cir. 1995)............................................21

*U2 Home Entertainment, inc. v. Wei Ping Yuan,* 245 Fed. App'x 28, 29 (2nd Cir. 2007) .........21

*EMI Entertainment World, Inc. v. Karen Records, Inc.,*
806 F. Supp. 2d 697 (S.D.N.Y. 2011)......................................................... 23, 24, 26

*Broad Music, Inc. v. Prana Hospitality, Inc.,* 158 F. Supp. 3d 184, 197 (S.D.N.Y. 2016).24

*Arista Records LLC v. Lime Group,* 784 F. Supp. 2d 398, 437-38 (S.D.N.Y. 2011)(quoting
*Musical Products, Inc. v. Roma's Record Corp.,* 2007 U.S. Dist. LEXIS 16064, at *1 (E.D.N.Y.
March 7, 2007..............................................................................................25, 26

*Stumm v. Drive Entertainment, Inc.,* 2001 U.S. Dist. LEXIS 21675 at*15 (S.D.N.Y. December
27, 2001)(quoting *Blum v. Kleine,* 1988 U.S.Dist. LEXIS 4424, at*2 (S.D.N.Y. May 17,
1988)........................................................................................................25

*eBay, Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 394 (2006)................................27

*Broad. Music, Inc. v. Prana Hosp., Inc.,*
158 F. Supp. 3d 184, 195 (S.D.N.Y. 2016)................................................27, 28

*WPIX, Inc. v. IVI, Inc.,* 691 F.3d 275, 285 (2d Cir. 2012)............................27, 28, 29

*HarperCollins Publrs., LLC v. Open Rd. Integrated Media, LLP,* 58 F. Supp. 3d 380, 386-87
(S.D.N.Y 2014) (quoting *Broad. Music, Inc. v. PAMDH Enters.,* 2014 U.S. Dist. LEXIS
84409, at *13 (S.D.N.Y June 19, 2014)........................................................27

*TechnoMarine SA v. Giftports, Inc.,* 758 F.3d 493, 504 (2d Cir. 2014).....................27

*SEC v. Manor Nursing Ctrs., Inc.,* 458 F.2d 1082, 1100 (2d Cir. 1972)...................27

*Ravia Entm 't, Ltd. v. Allstar Vending, Inc.,* 97 F. Supp. 3d 536, 547 (S.D.N.Y. 2015)......28

*Broad. Music, Inc. v. Prana Hospitality, Inc.,*
158 F. Supp.3d 184, 195 (S.D.N.Y. 2016)...................................................28

*Register.com, Inc. v. Verio, Inc.,* 356 F.3d 393, 404 (2d Cir. 2004).........................28

*Broad. Music, Inc. v. Living Room Steak House, Inc.,*
2016 U.S. Dist. LEXIS 23676, at *21 (E.D.N.Y. Feb. 26, 2016..............................29

*Mint, Inc. v. Iddi Amad,* 2011 U.S. Dist. LEXIS 49813, at*10-11 (S.D.N.Y. May 9, 2011)
(quoting *Windsurfing, Int'!, Inc. v. AMF, Inc.,* 782 F.2d 995, 1003 n.12 (Fed. Cir.
1986).................................................................................................29

*Salinger v. Coting,* 607 F.3d 68, 82 (2d Cir. 2009.........................................29

**Statutes**

17 US Code §107 of the Copyright Act......................................................1

17 US Code §504c of the Copyright Act....................................................18

I.    **Preliminary Statement**

Defendants have built a thriving business over decades on the copyright infringement and

piracy of other's property gained through hard work, investment and creative talent.  Defendants

claim to have acquired rights in ten (10) films (the "Infringing Films") that they knew or should

have known had not been authorized by the music publishers, record companies, or film

company Plaintiffs whose iconic musical compositions, sound recordings and film clip (together

the "Infringed Works") are embodied in those Infringing Films.[1]

The primary question in this case is whether Defendants' undisputed and extensive

copying and exploitation of the Infringed Works owned by Plaintiffs and fixed in the Infringed

Films constitutes copyright infringement or is protected Fair Use under §107 of the Copyright

Act (the "Act").  While Defendants have asserted in an affirmative defense that they have proper

licenses for the Infringed Works, that defense seems to have been abandoned by Defendants in

the sworn testimony of Coda Publishing, Ltd.'s ("Coda") owner, Robert Carruthers

("Carruthers"). (Carruthers TR. 44, 68, 89, 112)  As the Court can discern by simply watching

the Infringed Films, and as detailed and analyzed below, and in the accompanying declarations

and exhibits, the Defendants' use of the Infringed Works in the Infringing Films is non-

transformative, commercial, gratuitous, intended to trade on the popularity of such iconic artists

as the Rolling Stones, Lynyrd Skynyrd, Elton John, U2, Red Hot Chili Peppers, Nirvana and

ABBA, damaging to Plaintiffs' market for the Infringed Works, and in bad faith.  Thus, as a

matter of law, Defendants' use of the Infringed Works is not fair use and constitutes actionable

---

[1] Ownership of a sound recording is distinct from the ownership of the copyright in the musical composition itself.
See, Melville Nimmer and David Nimmer, Nimmer on Copyright §30.03.  Thus, exploitation of a sound recording
requires a license from both the owner of the underlying composition and from the owner of the recording.
Similarly, an ownership of a film is separate from the ownership of any musical composition and/or sound recording
contained in that film.

copyright infringement.  In addition, the actions and inactions of the Defendants demonstrate that their acts of copyright infringement were willful and that Plaintiffs are entitled to injunctive relief to prevent what has been a systematic appropriation of their copyrighted material by these Defendants.  Lastly, the control and actions by Defendants Carruthers and Gwilym Davies ("Davies"), to further the actions of Coda (which has no employees) renders such individuals personally liable for damages occasioned by the copyright infringement complained of.

In sum, a basic appraisal of the Infringing Films and the undisputed and indisputable evidence in this case permit the Court to grant Plaintiffs' motions (i) precluding Defendants from submitting or relying upon any statement from Michael C. Donaldson ("Donaldson") including Donaldson's expert report, (ii) granting Plaintiffs summary judgment, (a) dismissing all of Defendants' affirmative defenses; (b) declaring that Defendants' uses of the Infringed Works in the Infringing Films constitute willful copyright infringement and is not Fair Use; (c) finding Defendants liable for copyright infringement; finding Carruthers and Davies individually liable for the infringing actions of Coda and its agents; (d) granting Plaintiffs a permanent injunction enjoining Defendants from exploiting the Infringed Works and the property of the Plaintiffs (e) dismissing  all Defendants' affirmative defenses and (f) setting this matter down for a trial as to statutory damages.

## II.    **Statement of Facts**

Many of the facts are contained in the accompany declarations of Ed Arrow (**"Arrow Dec"),** Alasdair McMullan, Esq. **("McMullan Dec"),** Simon Bourn, Esq. **("Bourn Dec"),** Joy Murphy **("Murphy Dec")**, Don Terbush **("Terbush Dec")**, William Pittenger, Esq. **("Pittenger Dec"),** and Michael B. Kramer, Esq. **("MBK Dec")** and will not be repeated herein.

2

A.    **The Plaintiffs**

The Plaintiffs, UMG Recordings, Inc. Universal Songs of Polygram International Inc., Polygram Publishing Inc., Songs of Universal, Inc. Universal Music Corp., Capitol Records, LLC, ABKCO Music & Records, Inc.("AMR") and ABKCO Music, Inc. ("AMI")[2] are respected record companies, music publishing companies and film companies with a rich history of producing, manufacturing, distributing, selling and otherwise exploiting musical compositions and sound recordings by many of the most famous recording artists in history. The Plaintiffs own and control thousands of musical compositions and sound recordings by some of the most renowned songwriters and artists of the last six decades. Plaintiffs have invested and continue to invest substantial monies along with time and effort and creative talent to identify, support artists and songwriters to develop their talents and then to record, manufacture, advertise and commercially exploit the musical compositions and sound recordings. Plaintiffs exploit their works through the sale and streaming of the works on various Internet and satellite platforms and by licensing those works to third parties for films, commercials and other uses. To acquire these rights, Plaintiffs took and continue to take very substantial financial risks and creative efforts. The monies that Plaintiffs receive from the exploitation of their sound recordings and musical compositions are shared with the recording artists and the writers who, with great justification, deserve compensation for their creative efforts.

A significant number of the sound recordings and the musical compositions owned by Plaintiffs are part of any top list of the top 500 songs and recordings of the Rock Era. Plaintiffs also own and exclusively distribute music videos associated with their artists and songwriters.

---

[2] Universal Songs of Polygram International Inc., Polygram Publishing Inc., Songs of Universal, Inc. and Universal Music Corp. are collectively referred to as the "UMPG Plaintiffs". UMG Recordings, Inc. and Capitol Records, LLC, are collectively referred to as the "UMG Plaintiffs". AMR and AMI are collectively referred to as the "ABKCO Plaintiffs".

3

By way of example, the film "The Rolling Stones Rock-n-Roll Circus" was produced and is owned by Plaintiff, AMR (d/b/a ABKCO Films) and is one of the Infringed Works which was used without authorization in the Infringing Films. The UMG Plaintiffs, and their artists, produce numerous music videos and films to market their music in a manner they deem artistically and commercially appropriate.

**Defendants and their Actions**

Coda was formed in 2008 under the name Coda Books Ltd. Since its inception, Coda has for all intents and purposes been owned and controlled by Carruthers. (Carruthers TR. 11:12-15, 20-21). Carruthers testified that he has been exploiting music films using the same style as the Infringing Films for the past forty years (Carruthers TR.111:2). The Infringing Films are third party (not the Defendants) filmed performances of Lynyrd Skynyrd, The Rolling Stones, ABBA, U2, Nirvana, Elton John and Red Hot Chili Peppers ("RHCP") who are some of the great artists of the last 60 years culled together. (MBK Dec Ex. 8) It is unclear as to how Coda obtained the right to the film clips which make up the Infringing Films since Carruthers testified that he had nothing to do with the production of the Infringing Films. (Carruthers TR. 145-147).[3] Moreover, the Defendants have not produced a single document relating to the production of the Infringing Films or the acquisition by Coda of any rights to any element of the Infringing Films including the clips comprising the Infringing Films, the individuals who appear in the Infringing, and the music and recordings contained therein. (MBK Dec par. 23). Defendant, Vision Films, Inc. ("Vision") is a California company owned by Lise Romanoff ("Romanoff") who since 2012 has acted as Coda's agent in exploiting the Infringing Films and many others throughout the World.

---

[3] Despite the denials by Mr. Carruthers, the metadata of film information he has sent to Vision as part of their agreements show that each one of the films was allegedly produced by the Creative Picture Company Ltd. (an entity unrelated to Coda except it was also owned by Mr. Carruthers), directed, written and created by Mr. Carruthers. (See, Coda bates stamp 747).

### A.    The Vision/Coda 2012 Agreement

Sometime in 2012, Romanoff met Davies at MIPTV or MIPCOM in Cannes and discussed the possibility of Vision acting as worldwide sales agent for Coda (then known as Coda Books Ltd) (Davies TR. 54:9-21)  Romanoff testified that she had reviewed Coda's catalog of available films and struck an agreement with Davies (Romanoff TR.29:1-14)  In discovery, Plaintiffs demanded all film catalogs of Coda which were never produced (Romanoff TR.29:15-17).  Vision drafted a "Sales Agency Agreement" between Vision and Coda dated August 31, 2012 (MBK Dec Ex. 14).  The agreement was reviewed by Davies who passed it on to Carruthers saying that the agreement looked "fairly standard". Davies was authorized by Carruthers to execute the agreement (the "2012 Vision Agreement") and executed it as Coda's "Financial Director". Davies was Coda's contact for notices in the 2012 Vision Agreement (MBK Dec Ex. 14).

The 2012 Vision Agreement contained a representation in Par 3 that Coda had obtained all necessary licenses including those required from record companies and publishing companies with whom the artists in the films might have contractual arrangements. (MBK Dec Ex. 14, par. 3).  Davies testified that if films were in the Coda catalog all licenses had been obtained but he never checked. (Davies TR. 66-68) Davies thinks he might have been paid a commission by Coda for arranging the 2012 Vision Agreement (Davies TR. 55).

### B.  The 2017 Vision Agreement

Davies testified that, prior to October 26, 2017, he and Romanoff negotiated a new agreement between Coda and Vision (the "2017 Vision Agreement") (MBK Dec Ex. 16).  Vision drafted the agreement and prepared the Schedule A (the film titles) from Coda's catalog.  Again, Davies executed the 2017 Vision Agreement as Coda's "Financial Director" and remained

Coda's contact for notices.  Davies also testified that he assumed that if a film was in the catalog, all clearances had been obtained. (Davies TR. 67) The 2017 Vision Agreement contained grants of rights for the World except for minor territories for some films.  The grant of rights to Vision was expansive and included all Video on Demand, Subscription rights, Internet Right, Pay Per View, Theatrical and TV rights. (MBK Dec Ex. 16, p.1)  It also required delivery by Coda of "chain of title documents" **as a condition precedent** (MBK Dec Ex. 16, par. 2).  None of the chain of title documents were ever delivered to Vision but despite this Vision never attempted to verify the representation of Coda because she assumed that Coda, with so much experience, would have not licensed the Infringing Films without having the right to do so.

In neither the 2012 or the 2017 Vision Agreement does Coda state that no licenses or consents were required for the use of the musical compositions and sound recordings contained in the Infringing Films on the basis that they were covered by the doctrine of Fair Use. (MBK Dec par. 29)

### The Dispute

As part of AMR and AMI procedures in monitoring internet sites and platforms with regard to its compositions, artists and recordings, the AMR marketing staff came across the two Infringing Films regarding The Rolling Stones appearing on Amazon (Pittenger Dec par. 12). The site offered the films for sale as DVD's, as well as for digital download and streaming. Upon further investigation, AMR and AMI discovered that eighteen (18) of AMI's musical compositions were used in these film (some with several uses); that the master recording of "Gimme Shelter" and a clip of a portion of the motion picture, "The Rolling Stones Rock n' Roll Circus", both owned by AMR, were included in the films. (Pittenger Dec par. 4)

AMR contacted UMG who acts as the distributor of AMR recordings in the United States to advise them of the finding.  UMG and UMPG both did their own searches and discovered eight (8) films also on Amazon which contained sixty (60) of the UMPG Plaintiffs' musical compositions and five (5) of UMG's sound recordings (Murphy Dec par. 3). The Pittenger Declaration par. 13-14 and the Murphy Declaration par. 13-18 show the percentage of time for the uses of the Infringed Works in each of the ten (10) films represent to the total timing of the Infringed Films in which they are contained.  No license for the synchronization or exploitation of the Infringed Works in the Infringing Films was ever granted by the Plaintiffs.  While the Defendants had, from the beginning, maintained that ten (10) DVD1 Notification forms between 2006 and 2008 issue to the Creative Picture Company Limited (MBK Dec Ex.13) represented "licenses", those claims were walked back by the testimony of Carruthers and by the accompanying declaration of Simon Bourn, Esq. from PRS for Music, Ltd.

On March 26, 2019, counsel for the Plaintiffs sent a cease and desist letter to Vision (MBK Decl Ex. 9).  Romanoff, on behalf of Vision, wrote e-mails to counsel (MBK Dec Ex. 10) claiming that Vision was just the agent for Davies [Coda] and that she would be contacting him. When Coda refused to produce any documents or agree to cease their exploitation of the Infringing Films the Plaintiffs commenced this action by filing a summons and complaint and, thereafter a First Amended Complaint.  Defendants answered citing various affirmative defenses including Fair Use, but no counterclaims.

During discovery, by reviewing metadata given to Vision, (MBK Dec Ex. 6) the Plaintiffs discovered that, in addition to the ten (10) Infringing Films, Carruthers and Coda licensed to Vision at least an additional ninety (90) other musical films of the same genre as the

Infringing Films, several of which contained musical compositions and sound recordings of the Plaintiffs.

Coda has produced not a single document relating to their "chain of title" to the Infringing Films, including the acquisition of the rights to use the clips, any agreement with the original copyright owners of the films, licenses for the use of compositions and sound recordings, agreements with individuals appearing the Infringing Films or proof of payment for any of the foregoing.

## III.    <u>Argument</u>[4]

### A.    <u>Legal Standards</u>

Summary judgment is appropriate when, even "viewing the evidence in the light most favorable to the nonmoving party, there is no genuine dispute as to any material fact." *10 Ellicott Square Court Corp. v. Mt. Valley Indem. Co., 634 F.3d 112* (2d Cir. 2010); Fed. R. Civ. P. 56(a). The Supreme Court has made clear that "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial," and summary judgment should be granted. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009). To survive summary judgment, a non-movant must go beyond the pleadings and 'set forth specific facts that show a genuine issue for trial. *Lue v. JPMorgan Chase & Co., 768 Fed. Appx. 7,* (2019). "The mere existence of a scintilla of evidence…will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Alexander v. Bd. of Educ.,* 648 Fed. Appx. 118 (2016). Moreover, merely questioning the credibility of, or alleging a bias in, a movant's evidence is insufficient to avoid summary judgment. *Ashley v. City of New York,* 2017 *U.S. Dist. LEXIS* 107980 ("[N]either a desire to cross-examine an affiant nor an unspecified hope of undermining his or her credibility suffices to avert summary judgment.")).

---

[4] All citations and quotations are omitted unless otherwise noted.

There is no dispute in this case, but that Defendants copied protected aspects of the Plaintiffs' owned or exclusively controlled Infringed Works by excerpting the Infringed Works in the Infringing Films. *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.,* 602 F.3d 57 (2010) (elements of copyright infringement are ownership and copying). Thus, the only questions relevant to the complete determination of liability in this action are: (i)) whether Plaintiffs can demonstrate title to the Infringed Works; (ii) whether the Defendants received licenses for the synchronization and exploitation in the United States of the Infringed Works in the Infringing Films; (iii) whether Defendants' use of the Infringed Works in the Infringing Films constitutes Fair Use under §107 of the Copyright Act (the "Act"); (iv) whether the Defendants have standing to assert a defense of Fair Use; (v) whether Defendants' infringement was willful; (vi) whether the Plaintiffs are entitled to a permanent injunction and (vi) whether the individual Defendants are liable for infringement based upon their control of the corporate defendant, Coda Publishing, Ltd. ("Coda").

Regarding Plaintiffs' *Daubert* motion, expert testimony is only admissible if "the expert's scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." FRE 702. Expert testimony admitted under FRE 702 must be both relevant and reliable. *See* FRE 702 (expert testimony must be "the product of **reliable principles and methods**" [Emphasis added] and the expert must have "reliably applied the principles and methods to the facts of the case."); *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 589 (1993); Even if a court finds that expert testimony is admissible under Rule 702, the court may still exclude the testimony under Rule 403. *See Rogers v. Raymark Indus.,* Inc., 922 F.2d 1426, 1430 (9th Cir. 1 9 9 1) (citing *McGlinchy v. Shell Chem. Co.,* 845 F.2d 802, 806 (9th Cir. 1988). Under FRE 403 "a

court may exclude evidence if its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, or misleading the jury." *U.S. Securities & Exchange Com'n v. Jensen,* 835 F.3d 1100, (9th Cir. 2016). "Where the probative value [of evidence or testimony] is slight, moderate prejudice is unacceptable." *US v. Ramirez-Robles,* 386 F. 3d 1234, 1243 (9th19 Cir. 2004).The trial court must act as a "gatekeeper" by preliminarily determining whether the expert's proposed testimony is acceptable. *See Elsayed Mukhtar v. Cal. State Univ. Hayward,* 299 F.3d 1053, 1063 (9th Cir. 2002); *Murray v. Southern Route Maritime SA,* 870 F. 3d 915, 923 (9th Cir 2017) ("District judges play an active and important role as gatekeepers examining the full picture of the experts' methodology and preventing shoddy expert testimony... from reaching the jury."). The proponent of expert testimony has the burden of establishing that it is both relevant and reliable by a preponderance of the evidence.

### B.    Defendants' Use of the Infringed Works Is Not Fair Use

"Fair use is a mixed question of law and fact," but if there are no genuine issues of material fact, or if, even after resolving all issues in favor of the opposing party, a reasonable trier of fact can reach only one conclusion, a court may conclude as a matter of law whether the challenged use qualifies as a fair use of the copyrighted work. *Stern v. Lavender,* 319 F. Supp. 3d 650, 2018 U.S. Dist. LEXIS 121405 (S.D.N.Y. 2018). Because fair use is an affirmative defense, Defendants bear the ultimate burden of proving that their use of the Infringed Works in the Infringing Films was fair. *Stern, supra.*

"Section 107 requires a case-by-case determination whether a particular use is fair, and the statute notes four nonexclusive factors to be considered." *Harper & Row Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539, 549 (1985). Those factors are: (1) "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes"; (2) "the nature of the copyrighted work"; (3) "the amount and substantiality of the

10

portion used in relation to the copyrighted work as a whole"; and (4) "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107. The factors "are to be…weighed together, in light of the objectives of copyright 'to promote the progress of science and the useful arts'". *Geophysical Union v. Texaco Inc., 1994* U.S. App. LEXIS 36735 (1994).

This Court's analysis of Defendants' fair use defense in this case should be guided by the Ninth Circuit's analysis and rejection of the fair use defense in *Elvis Presley Enters., Inc. v. Passport Video*, 349 F.3d 622 (9th Cir. 2003) which considered a remarkably similar set of facts and the very recent decision of the 2nd Circuit in *Andy Warhol Found for the Visual Arts v. Goldsmith*, 2021 U.S. App. LEXIS 25277, ___ F. 4th___, 2021 WL 3742835. Also, importantly in this case, the fair use analysis should be undertaken with respect to the entire amount of each Infringed Work used in the respective Infringing Film, even if the use is split or repeated among multiple clips. *See, e.g., Threshold Media Corp. v. Relativity Media, LLC*, 66 F.Supp.3d 1011 (C.D. Cal. Mar. 19, 2013) (performing a single analysis for multiple clips of the same two works).

### 1.    The Purpose and Character of Defendants' Uses

The first fair use factor "has two primary components: (1) whether the use is commercial in nature, rather than for educational or public interest purposes; and (2) whether the new work is transformative or simply supplants the original." *Oracle America, Inc. v. Google LLC*, 886 F.3d 1179, 1196 (Fed. Cir. 2018). Courts also consider whether the infringer acted in bad faith. *See id.* (citing *Harper & Row v. Nation Enterprises, et al* 471 U.S. 539, 562 (1985)). Here, each element of the "purpose and character" factor weighs against a finding of fair use.

### i.    Defendants' Uses Are Exclusively Commercial

Commercial use of a copyrighted work "tends to weigh against a finding of fair use." *Harper & Row*, 471 U.S. at 562. "The degree to which the new user exploits the copyright for commercial gain—as opposed to incidental use as part of a commercial enterprise—affects the weight we afford commercial nature as a factor." *Oracle*, 886 F.3d at 1197. The question "is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." *Harper & Row*, 471 U.S. at 562.

11

There is no question that that Infringing Films are commercial—Defendants' primary consideration in exploiting the Infringing Films was to make money. In addition, to the Infringing Films, Coda exploits almost 100 other such "documentary" films of the same format of using clips of performances of the great rock n' roll artists (e.g., The Beatles, The Eagles and Michael Jackson) combined with non-specific commentary from non-experts. (MBK Dec Ex. 6) Coda contracted with Vision to act as Coda's agent in the United States (MBK Dec Ex. 14, 16) with respect to the Infringing Films in exchange for Vision receiving thirty (30%) percent of gross revenues collected by Vision as a result of the exploitation of the Infringing Films[5]. More important, however, is that Defendants sought to exploit the Infringed Works in particular "for commercial gain" and "without paying the customary price." As Vision acknowledged and as shown by the agency agreements between Vision and Coda, Vision never provided copies of the Infringing Films to any educational institutions or for any educational purpose. (Romanoff TR. 125:6-10) Indeed, as in *Passport*, "[i]n total, at least 5% to 10%" of the Infringing Films (in the instant case between 8% percent and 58% to be specific) are comprised of the Infringed Works, 349 F.3d at 625, making it effectively impossible to separate the commerciality of Defendants' exploitation of the Infringed Works from the commerciality of the Infringing Films as a whole. Simply put, the Infringing Films were and are merely a "delivery system" for the musical compositions, sound recordings and filmed performance of the greatest artists of the Rock era. Thus, the commercial element of the first fair use factor is met not just by the fact that Defendants expected and intended to make money from the Infringing Films, but also by the fact that Defendants could not have expected to make that money without the inclusion of the Infringed Works. The Infringed Works were not included to supplement the "commentary" contained in the Infringing Films but to furnish the sole incentive for the public to spend money to purchase or rent the Infringing Films. This point is made clear by the fact that two of the Infringing Films, "The Rolling Stones-Big Hits (High Tide and Green Grass)" and "The Rolling Stones-Their

---

[5] The "territory" of the agreements between Vision and Coda was the United States and the rest of the World with some minor "carveouts" of territories.

Satanic Majesties" have the exact and virtually exact same title as two of The Rolling Stones' albums which are owned by AMR.

### ii.    Defendants' Uses of the Infringed Works Is Not Transformative

A new work is not "transformative" if it "merely supersede[s] the objects of the original creation." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994). Instead, the new work must "add[ ] something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Id.* Significantly, "taking only select passages of a copyrighted work is, by itself, not transformative," and "no plagiarist can excuse the wrong by showing how much of his work he did not pirate." *Oracle*, 886 F.3d at 1200-01. Moreover, "courts have been reluctant to find fair use when an original work is merely retransmitted in a different medium." *Id.* at 1202. Further, where purported "commentary has no critical bearing on the substance or style of the original composition, which the alleged infringer merely uses to get attention or to avoid the drudgery in working up something fresh, the claim to fairness in borrowing from another's work diminishes accordingly (if it does not vanish), and other factors, like the extent of its commerciality, loom larger." *Campbell*, 510 U.S. at 580. Also, simply providing a voice-over does not by itself add "anything new or transformative" to the original work. *KCAL-TV*, 108 F.3d 1119, 1122 (9th Cir.1997).

Here, the Infringing Films do not add anything to provide a different purpose or character for or alter the Infringed Works in any manner that could be deemed "transformative." Instead, the Infringing Films simply incorporate between at a minimum of 1½ minutes and as much as 13 minutes ("Smell Like Teen Spirit") and 19 minutes ("Free Bird") of each of the Infringed Works for their purported narrative relating the music of Nirvana, Lynyrd Skynyrd  Elton John, Red Hot Chili Peppers ("RHCP") U2, ABBA and The Stones. In many cases the clips of the Infringed Works are neither interrupted nor contextualized and contain no voice-over or other alterations or additions. The Infringing Films rarely "comments" on the "substance or style" of the seventy-eight (78) of Plaintiffs' musical compositions, six (6) sound recordings and one (1) film included in the Infringed Works and makes no reference at all to many of them.  Worse, all the Infringed

Works are used in the Infringed Films for the exact same purpose as originally intended: to entertain with the respective artist's music, sound recordings or filmed performance. In short, the Infringing Films, collectively, transform the Infringed Works not at all.

The Ninth Circuit's discussion of transformation in *Passport* is particularly apt to the present analysis:

> *Passport's use of Plaintiffs' copyrights is not consistently transformative. True, Passport's use of many of the television clips is transformative because the clips play for only a few seconds and are used for reference purposes while a narrator talks over them or interviewees explain their context in Elvis' career. But voice-overs do not necessarily transform a work. There must be real, substantial condensation of the materials...and not merely the facile use of scissors; or extracts of the essential parts, constituting the chief value of the original work. It would be impossible to produce a biography of Elvis without showing some of his most famous television appearances for reference purposes. But some of the clips are played without much interruption, if any. The purpose of showing these clips likely goes beyond merely making a reference for a biography, but instead serves the same intrinsic entertainment value that is protected by Plaintiffs' copyrights. We think Passport's use of significant portions of The Steve Allen Show is especially troubling. While showing a clip from these television shows is permissible to note their historical value, Passport crosses the line by making more than mere references to these events and instead shows significant portions of these copyrighted materials.*

349 F.3d at 628-29. This analysis, which underlies the Ninth Circuit's affirmation in *Passport* of "[t]he district court's decision that the first factor weighs against fair use," *id.* at 629, applies almost exactly in the present case and should yield the same result here.

#### ii. Defendants' Uses Were In Bad Faith

The Ninth Circuit applies "the general rule that a party claiming fair use must act in a manner generally compatible with principles of good faith and fair dealing," which is "based on the fact that fair use presupposes good faith and fair dealing" and also on the fact that "one who acts in

bad faith should be barred from invoking the equitable defense of fair use." *Oracle*, 886 F.3d at 1202. In other words, "the propriety of the defendant's conduct is relevant to the character of the use at least to the extent that it may knowingly have exploited a purloined work for free that could have been obtained for a fee." *KCAL-TV*, 108 F.3d at 1122. While it is true that "being denied permission to use a work does not weigh against a finding of fair use" because "[i]f the use is otherwise fair, then no permission need be sought or granted," *Campbell*, 510 U.S. at 585 n.18, it is also true that "a copyist's good faith cannot weigh in favor of fair use." *Oracle*, 886 F.3d at 1203.

In *KCAL-TV*, the Ninth Circuit determined that the first factor weighed against the secondary user in part because it did not request a license and instead "obtained a copy of the tape from another station, directly copied the original, superimposed its logo on the film footage, and used it for the same purpose for which it would have been used had it been paid for." 108 F.3d at 1122. Here, as in *KCAL-TV*, Defendants have produced nothing to show how they obtained the film clips which they culled together to make the Infringing Films. Those film clips contained the Infringed Works. Defendants did not request licenses for the Infringed Works from the Plaintiffs which would be required for the exploitation of the Infringing Films in United Stated and instead used the Infringed Works for the same purpose for which they would have been used had they been paid for. Defendants have provided no proof that they actually created or own the Infringing Films. No licenses, releases, agreements, assignments, proofs of payments were ever furnished by Defendants showing that Coda owned or controlled any element of the Infringed Films which they exploited worldwide. As Fair Use is an affirmative defense, the Defendants bear the burden of proof. One element of that proof surely would be that they actually own the work they are asserting made fair use of the copyright materials of others contained in such work.

As noted above, one has to look no further than the titles used by the Defendants for two of Infringing Films. One, entitled "Rolling Stones Big Hits (High Tide and Green Grass)" is the *exact* name of the Rolling Stones first "greatest hits" album. Could anything be more intentionally

15

misleading? [6] The second, "The Rolling Stones, "Their Satanic Majesties" is, again, virtually identical to the name of one of their most famous albums! Finally, and most significantly, the Defendants never sought nor obtained an opinion letter from their "expert", Michael Donaldson, Esq., the very "expert" whose law firm provides guidance for needed edits to "documentary" films for a fair use opinion. All told, Defendants' conduct does not indicate a good faith effort to use the Infringed Works consistent with the purpose of copyright law (i.e., "to promote the progress of science and the useful arts") but rather an attempt to exploit Plaintiffs' exclusive rights in the Infringed Works without paying the associated fees to Plaintiffs or compensation to the artists and writers whose performances and writings Defendants have willfully pirated.

### 2.    The Nature of the Infringed Works

The second fair use factor recognizes that "some works are closer to the core of intended copyright protection than others" and that "creative expression falls within the core of the copyright's protective purposes." *Oracle*, 886 F.3d at 1204. It is well-established that "works such as original songs [and] motion pictures...are creative in nature and thus fit squarely within the core of copyright protection." *Passport*, 349 F.3d at 629. The Infringed Works at issue in this case are all original compositions, sound recordings and films and, accordingly, this factor also weighs against a finding of fair use.

### 3.    The Amount and Substantiality of the Use

The third fair use factor focuses on the amount and substantiality of the portion used in the context of the copyrighted work, not the infringing work, and "[t]he Ninth Circuit has explained that this third factor looks to the quantitative amount and qualitative value of the original work used in relation to the justification for its use." *Oracle*, 886 F.3d at 1205. Courts should "look to see whether the heart of the copyrighted work is taken," *Passport*, 349 F.3d at 630, and give "thought not only about the quantity of the materials used, but about their quality and importance, too." *Campbell*, 510 U.S. at 587. While this factor will not necessarily weigh against an alleged

---

[6] On the cover of the Infringing Film, "Rolling Stones-Big Hits (High Tide and Green Grass)" it states that the DVD includes interviews with Marianne Faithful (Mick Jagger's former girlfriend), Keith Altham and Anita Pallenberg (Keith Richards former girlfriend) which do not exist on DVD. No such interviews are contained in the DVD.

infringer, even when he copies the whole work, if he takes no more than is necessary for his intended use, it has limited that guidance to circumstances "where the intended use was a transformative one, because the 'extent of permissible copying varies with the purpose and character of the use.'" *Oracle*, 886 F.3d at 1179 (quoting *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1178 (9th Cir. 2013)); *Lombardo v. Dr. Seuss Enters., L.P.*, 729 Fed. Appx. 131, (2d Cir 2018).

As shown above, Defendants' use of the Infringed Works in the Infringing Films was not transformative, and, as a quantitative matter, Defendants used far more of the Infringed Works than was "necessary" (to the extent any use of the Infringed Works even was necessary) to make Defendants' "points" in the Infringing Films. As a percentage of each complete Infringed Work, the Infringing Films' uses range from approximately sixty (60%) percent to ninety (90%) percent of each Infringed Work. Defendants used thirteen (13) minutes of Nirvana's "Smells Like Teen Spirit" alone. The original song is only one-third that length (Terbush Dec par.18).[7] Incredibly, the time of uses of the Infringed Works as a percentage of the total time of the Infringing Films in which they are used range between 30% to 58.33% save for the two RHCP' films. Those percentages would be higher (and in the case of RHCP, much higher) but for the fact that there are additional musical works featuring performances of RHCP in those films which were not owned by Plaintiffs and were not included in the calculation. By comparison, the single video clip deemed not to be fair use in *KCAL-TV* was only 30 seconds (out of four minutes and 40 seconds total), *see* 108 F.3d at 1122. Cases where Fair Use was found based on the amount used were much less significant as a percentage of the entire original works than in this case. *See Lennon v. Premise Media Corp.*, 556 F. Supp. 2d 310, 317 (S.D.N.Y. 2008) (analyzing use of 15 second audio clip from three minute sound recording); *Threshold Media Corp. v. Relativity Media, LLC*, 166 F. Supp. 3d 1011, 1026 (C.D. Cal. 2013) (analyzing use of 12 percent and 22 percent of two sound recordings)[8]; *Hofheinz v. AMC Productions, Inc.*, 147 F. Supp. 2d 127, 139 (E.D.N.Y.

---

[7] Defendants use over 6 minutes of "(I Can't Get No) Satisfaction" which is a 3:45 single.

2001) (use of clips averaging 26 seconds in length taken from "full-length feature films" was "*de minimis*" and "favor[ed] a finding of fair use").

Qualitatively, as well, the Defendants' use of the Infringed Works was significant, unnecessary, and unfair. In most cases the Defendants incorporated the "heart" of the compositions included in the Infringed Works—the chorus or portion referencing the work's title—with the obvious intent to provide to the Infringing Film's viewers "the most interesting and moving," *Harper & Row*, 471 U.S. at 565, and/or "most valuable," *KCAL-TV*, 108 F.3d at 1122, parts of the songs.

> Once more, the Ninth Circuit's *Passport* decision is instructive with respect to this factor: *Passport's use of clips from television appearances, although in most cases of short duration, were repeated numerous times throughout the tapes. While using a small number of clips to reference an event for biographical purposes seems fair, using a clip over and over will likely no longer serve a biographical purpose. Additionally, some of the clips were not short in length. Passport's use of Elvis' appearance on The Steve Allen Show plays for over a minute and many more clips play for more than just a few seconds. Additionally, although the clips are relatively short when compared to the entire shows that are copyrighted, they are in many instances the heart of the work. What makes these copyrighted works valuable is Elvis' appearance on the shows, in many cases singing the most familiar passages of his most popular songs. Plaintiffs are in the business of licensing these copyrights. Taking key portions extracts the most valuable part of Plaintiffs' copyrighted works.*

349 F.3d at 630. The Ninth Circuit's analysis again applies almost exactly in the present case and should yield the same result here.

### 4.    The Effect of Defendants' Use on Plaintiffs' Potential Market

The fourth fair use factor recognizes that "[f]air use, when properly applied, is limited to copying by others which does not materially impair the marketability of the work which is copied." *Harper & Row*, 471 U.S. at 566-67. This factor is "the most important element of fair

18

use." *Fox Broad. Co. v. Dish Network L.L.C.*, 747 F.3d 1060, 1069 (9th Cir. 2014) (quoting *Harper & Row*, 471 U.S. at 566)). This factor "requires that courts 'consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant…would result in a substantially adverse impact on the potential market for the original.'" *Oracle*, 886 F.3d at 1207 (quoting *Campbell*, 510 U.S. at 590)).

"In evaluating the fourth factor, courts consider not only harm to the actual or potential market for the copyrighted work, but also harm to the 'market for potential derivative uses,' including 'those that creators of original works would in general develop or license others to develop.'" *Id.* at 1208. (quoting *Campbell*, 510 U.S. at 592)). "A court can therefore consider the challenged uses' impact on potential licensing revenues for traditional, reasonable, or likely to be developed markets." *Id.* (citing *Seltzer*, 725 F.3d at 1179). "Also relevant to the inquiry is the fact that a copyright holder has the exclusive right to determine 'when, whether and in what form to release' the copyrighted work into new markets, whether on its own or via a licensing agreement. Indeed, courts have recognized that where, like here, the Infringing Films were directly competitive with the Infringed Works and could even replace them Fair Use does not apply". *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, (2d Cir.1998).[9]

Here, Defendants' unlicensed use of the Infringed Works in the Infringing Films was damaging not only to Plaintiffs' actual licensing market for the Infringed Works but also to any potential new markets for the Infringed Works (or their derivatives) and, more broadly, to Plaintiffs' business model in general. Again, Plaintiffs have entire portions of their businesses devoted to the licensing of their intellectual property and those businesses generate significant revenue from that licensing activity, including by licensing the Infringed Works and other works

---

[9] There is a "presumption" of market harm where, as here, the infringing use is commercial *Ferdman v. CBS Interactive, Inc.*, 342 F. Supp. 3d 515, (S.D.N.Y 2018), *see also Disney Enterprises, Inc. v. VidAngel, Inc.*, 869 F.3d 848, 861 (9th Cir. 2017), *Passport*, 349 F.3d at 631, such a presumption is not necessary in this case because the scope of and damage to Plaintiffs' market and potential markets for the Infringed Works is well-established and undisputed.

by numerous artists and writers for use in film and television projects (such as documentaries). (Pittenger Dec par.11, Murphy Dec par. 4, 8, Terbush Dec par. 6, 8)  By taking the Infringed Works for free rather than paying the significant fees that other actual or potential licensees would expect, Defendants have delegitimized Plaintiffs' licensing departments' entire purpose and existence and have undermined and damaged a significant source of Plaintiffs' revenue. Defendants have also undermined and damaged potential new and derivative markets for the Infringed Works—such as a compilation of the Infringed Words or a meaningful, high-quality, professional biographical documentary of The Rolling Stones, U2, Elton John, Nirvana, Lynyrd Skynyrd, ABBA and Red Hot Chili Peppers by, "saturating" the market with Defendants substandard Infringing Films.

In sum, all four of the fair use factors (and each of their sub-elements) clearly and heavily weigh against a determination that Defendants' exploitation of the Infringed Works in the Infringing Films is fair use. Defendants have not and cannot meet their burden of proof on that affirmative defense, which should be rejected and dismissed, and Defendants' uses of each of the 85 Infringed Works should be deemed an infringement on Plaintiffs' Infringed Works.[10]

## C.    <u>Defendants' Infringement Was Willful</u>

Section 504(c) of the Copyright Act (the "Act) provides that where a Defendant's infringement is willful, statutory damages may be awarded in an amount up to $150,000.00 per infringement, 17 U.S.C. §504(c).  Infringement is willful when the defendant (i)was actually aware that its conduct was infringing, or (ii) acted with "reckless disregard" for, or with "willful blindness" to, the copyright holder's rights.  *Island Software & Computer Serv. v. Microsoft Corp.,* 413 F. 3d 257 (2nd Cir. 2005).  Willfulness can thus be established through circumstantial evidence that gives rise to the inference of willful conduct.  *See, Knit Waves, Inc. v. Lollytogs*

---

[10] Defendants also have not and cannot meet their burden of proof on the other affirmative defenses in the Answer, which similarly should be rejected and dismissed.

*Ltd.,* 71 Fed.3d 996, 1010 (2nd Cir. 1995) ("knowledge of infringement may be constructive rather than actual; that is, 'it may not be proven directly but may be inferred from the defendant's conduct'") ("*NAS Import Corp. v. Chenson Enters., Inc.*, 968 Fed.2d 250, 252 (2nd Cir. 1992)).

Courts may resolve the issue of willfulness on summary judgment if "there are sufficient undisputed material facts on the record to make the question appropriate for summary judgment." *Lipton Nature Co.,* 71 Fed. 3d 464, 472 (2nd Cir. 1995): *see, e.g., U2 Home Entertainment, inc. v. Wei Ping Yuan,* 245 Fed. App'x 28, 29 (2nd Cir. 2007) (affirming grant of summary judgment on willfulness).

Here there is *overwhelming* evidence that Defendants acted, at a minimum, with reckless disregard to Plaintiffs' rights in the Infringed Works. As shown above and in the supporting affidavits, Defendants claim to have somehow acquired the Infringing Films and with the Infringed Works already fixed thereon. Most of the Infringing Films were produced prior to Coda coming into existence. Moreover, Carruthers testified that he did not even know how Coda obtained rights in the Infringing Films (Carruthers Tr. 34:10-35:2) Whenever Coda began to exploit the Infringing Films, which, **at the latest**, was 2012 when the 2012 agency agreement with Vision was executed (MBK Dec Ex. 14), neither Coda, nor Carruthers nor Davies made any attempt to ascertain whether Coda had obtained the rights in the Infringed Works to commercially exploit the Infringing Films in the manner and in the territories. Mr. Carruthers, the sole owner of Coda confirmed that he did not get involved in clearances (Carruthers TR.43:16-25) and no documents or testimony were offered to show that anyone on behalf of Coda had made any attempt to verify whether the synchronization of the Infringed Work had been authorized. Coda and Mr. Carruthers' have since abandoned statements that the MCPS DVD1 documents (MBK Dec Ex. 13) constituted authorization for the synchronization and

exploitation of the Infringed Works which foreclose any argument by Defendants that they did not know licenses were required.[11]  The fact that the 2012 and 2017 Vision Agreements contained express representations of licensing similarly belie any argument that Davies, who executed both agreements on behalf of Coda, Carruthers who was the sole owner of Coda and Coda itself did not know that licenses were required.  Neither Vision agreement contains any statement that no license for the Infringed Works was required because the Infringed Works were subject to the Fair Use doctrine.

Vision surely knew that it could not exploit the Infringing Films without the approval from the holders of the underlying rights.  In the 2017 Vision Agreement Vision made certain to set out extensive obligations on the part of Coda to furnish Vision with copies of all licenses and clearances relating to the use of copyrighted material in the infringing films as well as clearances for the name, image and likeness of any individual appearing in the Infringing Films.  No such clearance information or licenses were ever produced by Coda to Vision for the Infringing Films, or the hundreds of other films exploited by Vision on behalf of Coda.  Nonetheless, such a production failure did not stop Vision from exploiting the Infringing Films in the United States. Vision's sole owner, Lise Romanoff's explanation for not insisting on the production of this material or conducting her own verification on behalf of Vision was that she (Vision) assumed that an experienced producer such as Coda would have had all of the clearances and licenses (Romanoff TR. 73:13-21 ).  Even Romanoff's excuse is absurd given that she and Vision had never dealt with Carruthers but only with Davies and, as of date that these issues first arose confirmed by e-mail to Plaintiffs' counsel, dated March 27, 2019, that she believed that Davies,

---

[11] While Carruthers states that they do not rely on licenses, the Defendants' "expert", Mr. Donaldson, goes out of his way to make the claim that Coda has "licenses" from MCPS that permitted the synchronization and commercial exploitation of the Infringed Works in the United States.

and not Carruthers or Coda was the owner of the Infringing Films! (MBK Dec Ex. 10)

It should also be noted that Vision and Romanoff are not strangers to music clearance and the obtaining of "Fair Use" opinions.  Romanoff has recently been a witness in a similar case in the USDC Central District of California, (Case No.: 2:19-cv-01192-CJC (KS)) with a producer of a documentary film, *which Vision distributed*, regarding the artist, *Drake*, in which there were allegations of copyright infringement based upon the use of copyrighted Drake master recordings.  In that matter, the producer obtained a fair use opinion letter from Mr. Donaldson's law firm in order to obtain E & O insurance for Vision.  This begs the question as to why Vision did not insist on the production of licenses from Coda or an opinion letter, in advance, from the Donaldson Callif Perez, LLP ("D + C") law firm.  The answer appears to be simple.  As Vision was indemnified by Coda and is now being covered by Coda's E & O carrier, Vision simply did not care.

Paragraph 2 of the Vision 2017 agreement, *Conditions Precedent*, provides: "VISION shall have no obligation to Licensor (Coda) until VISION approves, in its sole discretion, the Delivery Materials and **Chain of Title for the Rights** granted to VISION herein (emphasis added) hereunder". (MBK Dec Ex. 16)  Despite the complete lack of licenses, approvals and proof of the chain of title for the rights Vision was going to exercise in respect of the Infringing Films, Defendants through Vision digitized, mixed, remastered the Infringing Films and exploited same both in physical forms such as DVDs and over the Internet in the United States.  Nothing says "willful disregard" as much as that.

Given Vision's agreements with Coda requiring detailed clearances and license to be produced,  Defendants were fully aware of the protections affording copyright owners and that they were obligated to obtain licenses to exploit the Infringed Works. *See, EMI Entertainment*

*World, Inc. v. Karen Records, Inc.,* 806 F. Supp. 2d 697, 703 (S.D.N.Y. 2011) ("Courts in Eastern District have inferred willful infringement from a defendant's ownership of copyrights and experience in an industry heavily regulated by copyright law"). Carruthers stated at his deposition that he has been in the business of creating these "documentaries" for forty (40) years (Carruthers Tr.111:2) and Ms. Romanoff has been in the business for at least thirty (30) years (Romanoff Tr.7:8-9).

Coda and/or Carruthers continue to exploit, in the United States, many additional works owned by the ABKCO Plaintiffs and the Universal Plaintiffs through DVDs and internet downloads in films which, similar to the Infringing Films, the Defendants have not sought nor obtained any licenses. These films were only discovered during the course of discovery on the Metadata. (MBK Dec Ex. 6) Willfulness is often found were a defendant continued the infringing behavior after receiving notice of the license requirements or directions to cease and desist. *Broad Music, Inc. v. Prana Hospitality, Inc.,* 158 F. Supp. 3d 184, 197 (S.D.N.Y. 2016).

### D.    Carruthers and Davies Are Individually Liable for the Infringing Conduct of Coda

Carruthers admitted that at the time of his deposition and of the unlawful acts complained of he was the sole shareholder and director of Coda (Carruthers TR. 11:12-15, 20-21). Coda had no employees. According to Davies, Carruthers made the decision to enter into the 2012 and 2017 agreements with Vision but "authorized" Davies to execute the agreements on behalf of Coda. (Davies TR. 27:24-25) Neither made any effort to clear any rights to any portions of the Infringing Films or the Infringed Works.

The agreements with Vision contained representations of ownership by Coda, a company which had been formed **after** all of the Infringing Films had been made. Despite claiming that

24

he and Coda had nothing to do with the production of the Infringing Films (Carruthers Tr 6:7), Coda sent metadata information (MBK Dec Ex. 6) which listed Carruthers as the writer, producer and director of each of the Infringing Films as well as almost 100 other similar films. The Vision agreements had detailed "delivery requirements" including licenses and clearances for the music and film clips. Yet, Carruthers ignored these provisions and delivered no chain of title documents to Vision. For his part, Davies knew that Coda's only employee was Carruthers. Yet, despite reviewing the agreements and telling Carruthers that "they were fairly standard" he chose not to ensure that the ownership and clearance representations Coda was making were correct (Davies TR. 58:9-12). Those representations of the "Rights Granted" to Vision include the right to "sell, manufacture, sublease, license…and exploit" the Infringing Films in all forms of Video on Demand, subscription television, theatrical and television uses and Internet transmissions and downloads for the World with minor exceptions. Carruthers and Davies knew that Coda had none of those rights.

"It is well established that '[a]ll persons and corporations to participate in exercise control over or benefit from an infringement are jointly and severally liable as copyright infringers.'" *Arista Records LLC v. Lime Group,* 784 F. Supp. 2d 398, 437-38 (S.D.N.Y. 2011)(quoting *Musical Products, Inc. v. Roma's Record Corp.,* 2007 U.S. Dist. LEXIS 16064, at *1 (E.D.N.Y. March 7, 2007)). "An individual, including a corporate officer, who has the ability to supervise infringing activity and has a financial interest in that activity, or who personally participates in that activity is personally liable for infringement." *Stumm v. Drive Entertainment, Inc.,* 2001 U.S. Dist. LEXIS 21675 at*15 (S.D.N.Y. December 27, 2001)(quoting *Blum v. Kleine,* 1988 U.S.Dist. LEXIS 4424, at*2 (S.D.N.Y. May 17, 1988)).

While Carruthers has played a shell game by appointing and replacing numerous directors,

25

the fact is that he with occasional complicity from Davies has run the operations and activities of Coda. Carruthers had the authority to decide whether or not to commercially exploit the Infringing Films throughout the world without licenses. Davies also went along with the scheme. While claiming to execute the 2012 and 2017 Vision Agreements pursuant to verbal authorization from Carruthers, the fact is that Davies chose not to write "Authorized Agent" on the signature lines of the agreements. Instead, Davies went "all in" by signing **both** the 2012 and the 2017 agreements (as well as a 2013 amendment) as Coda's "Finance Director". (MBK Dec Ex. 14, 16)

Incredibly also, Davies, who claimed to just be doing Carruthers a favor is named as the Coda contact for notices in the 2012 and 2017 Vision Agreements. Carruthers clearly made sure that his name did not appear in those two agreements or the 2013 amendment.

Carruthers and Davies, thus exercised control over Coda and had a financial interest in Coda's infringing music reproduction, streaming and downloading activities. There is no genuine dispute that Carruthers is liable for Coda's infringement. See, e.g., *Arista Records LLC,* 784 F. Supp. 2d at 437-38 (granting summary judgment holding CEO liable for corporate infringements where CEO was 100% owner of corporate defendant and testified that he was the "ultimate decision maker" for corporate defendant): in *EMI Christian Music Group v. MP3 Tunes LLC*, 844 F.3d 79 (2nd Cir. 2016) (affirming liability finding against CEO and founder who was the ultimate corporate decision maker).

Based upon the foregoing, both Carruthers and Davies are individually liable for the infringing conduct of the Defendants.

       **E.**     **Plaintiffs Are Entitled to a Permanent Injunction Enjoining Defendants from Continuing to Infringe Plaintiffs' Infringed Works or Plaintiffs' Musical Copyrights, Sound Recordings or Films**

Courts are empowered to grant injunctions "on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a). "The decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts." *eBay, Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 394 (2006). In determining whether an injunction is appropriate, courts consider (1) whether the plaintiff will suffer an irreparable injury absent an injunction; (2) whether remedies at law, such as monetary damages, are adequate; (3) the balance of hardships; and (4) whether an injunction would serve the public interest. *See Broad. Music, Inc. v. Prana Hosp., Inc.,* 158 F. Supp. 3d 184, 195 (S.D.N.Y. 2016).

Here, all four factors weigh in favor of an injunction. The first two, irreparable harm and the adequacy of legal remedies, are often considered together. *See, e.g., WPIX, Inc. v. IVI, Inc.,* 691 F.3d 275, 285 (2d Cir. 2012). Thus, "courts have consistently found that '[h]arm can be irreparable, and adequate remedies at law lacking, where . . . , absent an injunction, the defendant is likely to continue infringing the copyright[.]'" *HarperCollins Publrs., LLC v. Open Rd. Integrated Media, LLP,* 58 F. Supp. 3d 380, 386-87 (S.D.N.Y 2014) (quoting *Broad. Music, Inc. v. PAMDH Enters.,* 2014 U.S. Dist. LEXIS 84409, at *13 (S.D.N.Y June 19, 2014)); *see TechnoMarine SA v. Giftports, Inc.,* 758 F.3d 493, 504 (2d Cir. 2014) ("The critical question for a district court in deciding whether to issue a permanent injunction ... is whether there is a reasonable likelihood that the wrong will be repeated.") (quoting *SEC v. Manor Nursing Ctrs., Inc.,* 458 F.2d 1082, 1100 (2d Cir. 1972)).

Defendants, especially Coda and Carruthers, have no intention of ceasing their infringing conduct absent an injunction. They ignored a litany of cease-and-desist

27

demands before this lawsuit was filed and continue to exploit hundreds of additional "films" of the same genre' as the Infringing Films expanded the scope of their infringing activities even while this case has been pending. Under these circumstances, courts in this circuit have not hesitated to grant injunctive relief. *See, e.g., Ravia Entm't, Ltd. v. Allstar Vending, Inc.,* 97 F. Supp. 3d 536, 547 (S.D.N.Y. 2015) (granting permanent injunction where "[defendant's] past behavior suggests that [it] might continue to engage in infringing activities ... demonstrating the danger that monetary damages will fail to fully provide [plaintiff] with relief'); *Broad. Music, Inc. v. Prana Hospitality, Inc.,* 158 F. Supp. 3d 184, 195 (S.D.N.Y. 2016) (granting injunction where "Defendants have adduced no evidence to suggest that they have stopped or will stop infringing plaintiffs' copyrights in the future").

Moreover, because Plaintiffs' license many of their musical compositions and sound recordings for use in live concert and other films, Defendants' pattern of unauthorized uses to create sub-standard but competing films harm Plaintiffs' relationships with their existing licensees, and to undermine their negotiating leverage with prospective licensees, in ways that are difficult to quantify. *WPIX Inc. v. IVI, Inc.,* 765 F. Supp. 2d 594, 618 (S.D.N.Y. 2011) (allowing viewers to access programming from unsanctioned sources would inevitably damage plaintiffs' ability to profit from sanctioned sources; such losses are notoriously difficult to prove and "nearly impossible to quantify"); *Register.com, Inc. v. Verio, Inc.,* 356 F.3d 393, 404 (2d Cir. 2004) (irreparable harm found where damage to business relationships could not be quantified).

The balance of equities also lies firmly with the Plaintiffs. Absent an injunction, Plaintiffs would be forced to file a succession of lawsuits each time Defendants infringe

Plaintiffs musical compositions, sound recordings and films which is occurring on a daily basis. *See Prana Hosp.,* 158 F. Supp. 3d at 196. ("Requiring plaintiffs to commence litigation for each future violation would pose a considerablehardship"); *Broad. Music, Inc. v. Living Room Steak House, Inc.,* 2016 U.S. Dist. LEXIS 23676, at *21 (E.D.N.Y. Feb. 26, 2016) ("Plaintiffs' burden of time and cost of litigating every future violation outweighs the burdens on the Defendants to obtain a license or to not infringe altogether").

Conversely, Defendants have known for more than a decade that their exploitation of films they have acquired without the permission of the owners of the film clips, recording companies, performing artists or music publishers is unlawful, and they "cannot be heard to complain if an injunction against continuing infringement destroys the business." *Mint, Inc. v. Iddi Amad,* 2011 U.S. Dist. LEXIS 49813, at*10-11 (S.D.N.Y. May 9, 2011) (quoting *Windsurfing, Int'l, Inc. v. AMF, Inc.,* 782 F.2d 995, 1003 n.12 (Fed. Cir. 1986)); *see WPIX, Inc.,* 691 F.3d 275, 287 (2d Cir. 2012) ("It is axiomatic that an infringer of copyright cannot complain about the loss of ability to offer its infringing product."); *Prana Hosp., Inc.,* 158 F. Supp. 3d at 196 ("the Court cannot detect any hardship that an injunction obliging defendants to comply with their legal duties would impose on them.")

Finally, "the public has a compelling interest in protecting copyright owners' marketable rights to their work and the economic incentive to continue creating . . . ." *WPIX,* 691 F.3d at 287; *see Salinger v. Coting,* 607 F.3d 68, 82 (2d Cir. 2009) (copyright law achieves its object of "promot[ing] the store of knowledge available to the public . . . by providing individuals a financial incentive to contribute to the store of knowledge"). This is especially so where Defendants are exploiting some of the most beloved and

valuable musical works of all time, without the permission of the record companies or music publishers who own those works. Allowing Defendants' infringing conduct to continue would distort the incentives that copyright law is designed to protect. Defendants must be enjoined from continuing this unlawful enterprise which harms Plaintiffs and the many, publishers, artists, writers and record companies from having their property appropriated without consent and without compensation.

### F.    The Plaintiffs' *Daubert* Motion Should Be Granted

As is evident from the "expert" report of Michael Donaldson the ("Donaldson Report"), his statements, testimony and the report itself are improper, are not reliable and any limited value they might have would be outweighed by the likelihood of the report and his testimony unfairly prejudicing the Plaintiffs at a trial. The Donaldson Report flies in the face of the law of Fair Use. Donaldson does not even make an attempt at distinguishing these controlling cases cited below.

Donaldson is an attorney and the lead partner of Donaldson Callif Perez, LLP ("D+C") whose business is, almost exclusively, representing film makers to review and suggest edits to film and television programs which would allow D+C to provide legal opinion letters as to the Fair Use of copyrighted material in those films for the comfort of the film maker's distributor(s) and liability insurance carrier.

As noted in Mr. Donaldson's Report, his opinion letters are often relied upon by distributors and insurance companies to distribute films and to issue errors and omissions policies for the producer and distributors of such films (MBK Dec Ex.1). D+C's process is for D+C to review the film first and offer editing suggestions or eliminations so as to, in D+C's opinion, make the film free from claims of infringements. In order to do so, D+C cannot find any copyright infringement in the film as each piece of copyrighted material must be subject to Fair Use.

Clearly, D+C was never asked, in advance to review these films (which were apparently produced between 2005-2007), by the Defendants, including Vision who has worked with D+C in obtaining opinion letters from the law firm so as to obtain errors and omissions policies from insurance carriers.

Even with the totally misguided and inapplicable process used by Mr. Donaldson in his report, he never stated that D+C would have issued an opinion letter that any of the Infringing Films would be totally covered by Fair Use. This is not surprising as even his report notes that of the works that he "reviewed" some of the uses were either clearly infringement and many uses were up in the air as to whether the use was an infringement or a Fair Use.

The conclusions reached in the Donaldson Report including every, assertion and analysis is based on nothing more than Donaldson's factual review of the Defendants' Infringing Films, his "personal experience" and his citation to handpicked case law. In other words, Donaldson has not and will not provide any actual expertise in this action but hopes to usurp the roles of the Court and the jury by weaving a factual narrative and providing biased legal opinions in favor of his clients. Donaldson completely ignores the Supreme Court's mandate in *Google LLC v. Oracle*, 142 S. Ct. 1183 (2021) as very recently discussed in detail in the Second Circuit's decision in *Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith*, 2021 U. S. App. LEXIX 2527 (2021) which required the consideration of each of the four statutory criteria for Fair Use in determining the issue of Fair Use. Instead, he uses his self- created standard of "first-hand knowledge of custom and practice for documentaries" to create a "cut and paste" report which provides repetitive non-specific factual repetition of what was said by people providing inexpert commentary about the specific groups as opposed to the extensive uses of the Infringed Works. Donaldson never refers to any of the individuals providing their expertise in the field of

musical opinion.  He does not know that the producer of the film used assisting engineers, weekend disc jockeys and session musicians to give the most obvious comments about iconic artists who, most, had never even met.

Donaldson cites to no case supporting his "custom and practice" methodology for determining Fair Use.  He also uses quack science to finesse the outrageous amount of copying by the Defendants in exploiting the Infringed Works in the Infringing Films. Where he can, he attempts to minimize those uses by only counting that portion of the use of the musical compositions or sound recordings that had the highest decibel level as if the remainder of the work copied at a lower level of volume does not count. (MBK Dec Ex.1)

Even with Donaldson's application of his own (as opposed to the Supreme Court's and the 2nd Circuit's) test for Fair Use which is not recognized by any court or any statute, of the approximately 100 uses of the Infringed Works in the Infringing Films, the Donaldson Report makes no Fair Use argument for 47 of those uses, and with regard to the remaining 50 uses, the Donaldson Report acknowledges that 16 of those are either on the margin of Fair Use and infringement or definitely not Fair Use. (MBK Dec Ex.1) Donaldson's opinions are undesirable for multiple additional reasons.  Donaldson recommends in his book, *Clearance and Copyright*, that secondary users should seek permission to use pre-existing works but fails to mention in his report the fact that permission to synchronize the Infringed Works and to exploit same in the United States was never sought by any of the Defendants.  Moreover, Donaldson's argument that "direct comment is not necessary for Fair Use" is contrary to the Supreme Court's clear holding in *Campbell v. Acuff Rose Music, Inc.* and virtually all of Donaldson's other opinions cite no case law or case law that is supportive or relevant to those opinions.

Demonstrating a complete lack of knowledge as to the licensing requirements in the

United States (absent Fair Use) to include musical works in a film, Donaldson in his report asserts, <u>as fact</u>, that those Infringed Works which are compositions (as opposed to sound recordings or films) were "licensed" by the Defendants by the Mechanical-Copyright Protection Society ("MCPS") for inclusion in the Infringing Films. Based upon the Declaration of Simon Bourn, Esq., MCPS licenses[12] were never issued to Coda but were issued to an entity, Creative Picture Company Ltd., who no longer exists, is not a party to this action nor a predecessor in interest to Coda. That a purported expert would go out and make such a statement clearly demonstrates that he has stepped beyond the bounds of opinion and is nothing more than another attorney advocating for the Defendants.

D+C relies almost exclusively on issuing so-called "Fair Use opinion letters" to independent film makers. Obviously, Donaldson's incentives in offering his own "opinions" are directly and unsuitably aligned with all other clients he and his firm have provided Fair Use opinions for because he has a personal, professional, reputational and financial stake in ensuring the D+C's Fair Use opinion letters which number at least 1,000 in the past few years are not found to be contrary to existing caselaw by the finding of law made by the Court in this case.

Donaldson's entire career has been built on advising and guiding secondary users in using pre-existing copyrighted works without permission and, as such, Donaldson is not an impartial third-party qualified and impelled to objectively review the facts of the case and provide an expert opinion thereon. Indeed, given his background and involvement in the underlying facts it would be impossible for Donaldson to provide any useful analysis or opinion in the action and any analysis or opinion he would provide would come with significant risk of

---

12. The DVD1 Agreement annexed to the Bourn Declaration makes clear that the agreement grants rights for limited acts in the United Kingdom only. No rights of synchronization in the United States are granted under the DVD1 scheme even if a license had been issued to Coda, which it was not.

prejudice, confusion or misleading this Court and/ a prospective jury.

Also notably missing from the Donaldson Report are the following:

- A qualification that he was assuming that Coda was the actual producer of the Infringing Films and had obtained the right to use the film clips which comprise the Infringing Films;

- A statement that he had not questioned the relationship of Creative Pictures Co Ltd, to Coda,

- A statement that he had investigated whether the MCPS "licenses" extended any rights in the United States and beyond DVD manufacture and sale in the U.K.

- An explanation for the use of the musical composition and master recording, *Gimme Shelter*, over the end credits of one of the Infringing Films;

- An explanation for the use of the film clip of a performance of the Rolling Stones lifted from the film "The Rolling Stones Rock n' Roll Circus "owned by Plaintiff AMR.

- Whether a party who has exploited a film without permission of the filmmaker can raise a defense of Fair Use to the exploitation of copyrighted material within the film that the party had no right to use.

For these reasons and reasons stated earlier regarding Fair Use, Plaintiffs respectfully request that the Court preclude the consideration of the Donaldson Report and preclude Defendants from offering any statements made by Donaldson or to be made by Donaldson in connection with this Motion for Summary Judgment or in connection with a trial of this matter.

**IV    CONCLUSION**

For all of the above reasons, Plaintiffs respectfully ask that the Court (i) grant Plaintiffs

Daubert motion precluding the Defendants from submitting or relying on any statement from their purported expert, Michael C. Donaldson, including Donaldson's Report dated August 20, 2021; (ii) grant Plaintiffs' motion for summary judgment (a) finding Defendants liable for willful infringement of each of Plaintiffs' Infringed Works (b) finding Defendants Carruthers and Davies personally liable for damages awarded in respect to Defendants' actions; (iii) permanently enjoining Defendants from any further exploitation of the Infringing Films containing the Infringed Works, (iv) absent statutory right, permanently enjoining Defendants, directly or indirectly, from exploiting without the written consent of Plaintiffs any of Plaintiffs musical compositions, sound recordings or films (v) setting the matter down for a trial on the issue of damages and (vi) awarding Plaintiffs the reasonable attorney's fees and costs of this action pursuant to the provisions of the Copyright Act.

Dated:    New York, New York
          September 29, 2021

**MICHAEL B. KRAMER & ASSOCIATES**

By: *s/ Michael B. Kramer*
Michael B. Kramer
mkramer@mkramerlaw.com
Artemis Croussouloudis
artemis@mkramerlaw.com
488 Madison Avenue
New York, NY 10075
Telephone: 212-319-0304
*Attorneys for Plaintiffs*