KIRK HOUSE GREEN LANE BOSHAM WEST SUSSEX UK PO18 8NT

By e-mail to   The Pro Se Intake Unit, Michael Kramer Associates and Candey Ltd.

ProSe@nysd.uscourts.gov

mkramer@mkramerlaw.com

jray@candey.com


Ref 19-CV-11892  In the **Southern District of New York (SDNY)**

2nd February  2026

Dear Judge Failla,

As you can see  from the attached e-mail (Appendix 1) On Saturday 16th January  Mr Ray unilaterally  informed me that following my letter of Candey Ltd were no longer acting for me personally under the Joint Candey Ltd CFA Agreement  in Claim as from Monday 18th January.

***'I will notify the court to confirm that I have ceased acting for you and will provide the Court with your contact details for the purpose of receiving the judgement'.***

I have subsequently received  no communication whatsoever from Mr Ray. I understand that he has filed a motion to withdraw.

It would appear I  am therefore a Pro se Litigant.

**MR KRAMER IS A NECESSARY WITNESS DUE TO HIS PERSONAL INVOLVEMENT IN THE ILLICIT UK FILM ' THE ROLLING STONES ROCK AND ROLL CIRCUS .**

I refer to the letter January  13th 2026 (DKT 248) in which Mr Kramer confirmed that  Abkco Films a division of Abkco Music and Records Inc continues to maintain claims to ownership of the 1968 illicit  film made in the UK in December 1968 and the resultant *locus standi* to sue for copyright infringement in the UK and elsewhere.

However,   Mr Kramer has previously served notice (Coda 001066) on behalf of ABKCO Films Inc that at the material time (26th March 2019) ABKCO Films Inc was the owner of copyright in the infamous illicit UK film  *'The Rolling Stones Rock And Roll* Circus' which was produced in December 1968 in breach of the Dramatic And Musical Performers Protection Act 1958 . On behalf of ABKCO films Inc  Mr Kramer falsely claimed  that Abkco Films inc  subsisted and possessed the *locus standi* to bring a copyright infringement claim film for international copyright infringement 'in the US and elsewhere' . However, it is common ground that this illicit film was abandoned by its UK makers  in 1968.

 Nonetheless after twenty-seven, years a  copyright claim to this illicit UK film was unlawfully filed  in the US Copyright office.
   i)         PA 0000886142 30th June 1997 Motion Picture .
   ii)        TX0004652126  30th June 1997 40 Page CD Booklet Crediting Lenne Allik as Producer
   iii)       PA0001294264 29th July 2005 DVD featuring unreleased 1968 footage

KIRK HOUSE GREEN LANE BOSHAM WEST SUSSEX UK PO18 8NT

By e-mail to   The Pro Se Intake Unit, Michael Kramer Associates and Candey Ltd.

ProSe@nysd.uscourts.gov

mkramer@mkramerlaw.com

jray@candey.com


Ref 19-CV-11892  In the **Southern District of New York (SDNY)**

2nd February  2026

Dear Judge Failla,

As you can see  from the attached e-mail (Appendix 1) On Saturday 16th January  Mr Ray unilaterally  informed me that following my letter of Candey Ltd were no longer acting for me personally under the Joint Candey Ltd CFA Agreement  in Claim as from Monday 18th January.

***'I will notify the court to confirm that I have ceased acting for you and will provide the Court with your contact details for the purpose of receiving the judgement'.***

I have subsequently received  no communication whatsoever from Mr Ray. I understand that he has filed a motion to withdraw.

It would appear I  am therefore a Pro se Litigant.

**MR KRAMER IS A NECESSARY WITNESS DUE TO HIS PERSONAL INVOLVEMENT IN THE ILLICIT UK FILM ' THE ROLLING STONES ROCK AND ROLL CIRCUS .**

I refer to the letter January  13th 2026 (DKT 248) in which Mr Kramer confirmed that  Abkco Films a division of Abkco Music and Records Inc continues to maintain claims to ownership of the 1968 illicit  film made in the UK in December 1968 and the resultant *locus standi* to sue for copyright infringement in the UK and elsewhere.

However,   Mr Kramer has previously served notice (Coda 001066) on behalf of ABKCO Films Inc that at the material time (26th March 2019) ABKCO Films Inc was the owner of copyright in the infamous illicit UK film  *'The Rolling Stones Rock And Roll* Circus' which was produced in December 1968 in breach of the Dramatic And Musical Performers Protection Act 1958 . On behalf of ABKCO films Inc  Mr Kramer falsely claimed  that Abkco Films inc  subsisted and possessed the *locus standi* to bring a copyright infringement claim film for international copyright infringement 'in the US and elsewhere' . However, it is common ground that this illicit film was abandoned by its UK makers  in 1968.

 Nonetheless after twenty-seven, years a  copyright claim to this illicit UK film was unlawfully filed  in the US Copyright office.
- i)         PA 0000886142 30th June 1997 Motion Picture .
- ii)        TX0004652126  30th June 1997 40 Page CD Booklet Crediting Lenne Allik as Producer
- iii)       PA0001294264 29th July 2005 DVD featuring unreleased 1968 footage

The subsistence of Abkco Films Inc and ownership was apparently borne out by the © copyright notice on DVD published in 2004 ( appendix 2 ) which states © ABKCO Films Inc which the defendants accepted at face value

The issue with Mr Ray began when I discovered that despite the Court Opinion and order of the Curt dated 28th September 2022 requiring

*'that to the extent that Plaintiffs have not produced the complete set of the Pittinger Documents, the Court instructs them to produce them immediately. More broadly , the Court expects that Plaintiffs have fully discharged their discovery obligations '*

I belatedly discovered William Pittinger had deliberately withheld from the Court vital, but undisclosed documents containing the vital © ( copyright ) and ℗ (phonograph) notices and the credits which confirm that Michael Kramer was instrumental in the 2019 unlawful release of the illicit 1968 UK film 'The Rolling Stones Rock and Roll Circus' . It is common ground that this film was made in the UK 10/11/12th December 1968 and abandoned due to its illicit status which is now the subject 1-19-CV-11892 -KPF .

It is unconscionable that Mr Kramer was personally involved in deposition and arguments in Court over 'The Rolling Stones Rock and Roll Circus' is the very film which Michael Kramer is litigating over on behalf of Plaintiff Abkco Films a division of Abkco Music and Records Inc which Mr Kramer abbreviates to 'AFI' . This action on the part of William Pittinger and Mr. Kramer raises fundamental ethical and procedural issues.

I therefore insisted that Mr Ray must make a motion that these hundreds previously undisclosed documents in the form of record Sleeves, books , CDs, DVDs, Laser Discs including the credits and the vital © ( copyright ) and ℗ (phonograph) notices and the correspondence with Mr Kramer and legal documentation which were in the possession and control of Mr Pittinger must be disclosed to the Court . To my astonishment Mr Ray refused to do so.

As you can see the undisclosed credits to the 2019 DVD and CD release the Film 'The Rolling Stones Rock and Roll Circus' CD and DVD release contains a personal credits to Michael Kramer which reads :

*'Special thanks to Michael Kramer' ( Appendix 3)*

Mr Kramer is also credits the 2019 soundtrack again credited 'Special thanks to Michael Kramer'

*'Special thanks to Michael Kramer' ( Appendix 3)*

As you can see from the credits Mr Kramer was personally instrumental, in 2019 in procuring the release of both the 1968 illicit UK film 'The Rolling Stones Rock and Roll Circus' and it's soundtrack. Mr Kramer's personal input is recognised in the credits of the illicit UK film and it's soundtrack as "special thanks to Michael Kramer" . Mr Kramer is therefore a **necessary witness** Along with the US attorneys Reynald Janairo and Jonas Herbsman along with Adam Barker of Universal.

It is common ground A "Special Thanks" credit, such as one to "Michael Kramer," is a standard industry practice used to recognize individuals who made significant and indispensable contributions to a film's production , but whose invaluable roles do not fit into the standard, paid crew categories (e.g., director, producer, editor) . Mr Kramer's role in offering crucial input

that allowed the film to be  by  advising on how to circumvent  the fact that the *'The  Rolling Stones Rock and Roll Circus'* is an  illicit UK film made in 1968.

All of the correspondence and documents generated by Mr Kramer's involvement  in  the release of  'The  Rolling Stones Rock and Roll Circus' should have been disclosed by William Pittinger on 28th September 2022   to the Court.

As I say, It is unconscionable that  'The  Rolling Stones Rock and Roll Circus' is the very film which Michael Kramer was instrumental is  now litigating over on behalf of . This  action on the part of Mr. Kramer raises fundamental  ethical and procedural issues.

1. Attorney Conduct & Disclosure. Mr Kramer's Recusal & Disclosure: Under [ABA Model Rule 3.7](), an attorney cannot act as an advocate at trial if they are likely to be a necessary witness. As Mr. Kramer was instrumental in the illicit film's publication , his personal knowledge of the facts and the documents which were makes him a crucial  witness. The "special thanks" credit is evidence of a personal connection that should typically be disclosed to avoid a conflict of interest.  For four yers Mr Kramer and William Pittinger have been misleading the tribunal.

Mr Kramer  has also conducted Depositions.  As Mr Kramer as attorney is a witness to the underlying disputed facts, conducting depositions on those same facts it is  improper and extremely prejudicial, as it combines the roles of advocate and necessary witness.

**THE ROLE OF ABKCO FILMS INC - INCORPORATED 27th MARCH 1970**

As you are aware Michael Kramer composed the letter before action dated 26th March 2019 on behalf of Abkco Films Inc ( which he abbreviated to AFI) .  However, it is common ground as both Mr Kramer and Mr Pittinger are well aware  ABKCO was incorporated on 27th March 1970 and did not subsist 26th  March 2019 having been merged out of existence on 24th March 1987 (B474263/3).   The bogus claim that ABKCO films inc was an active corporation which subsisted on 26th March 2019 and  owned the copyright in the film 'The Rolling Stones Rock and Roll Circus' is unconscionable.

The reason is that ABKCO films Inc is a fictitious corporation which  did not subsist either in 2004 r at the material time 26th March 2019

The unwarranted demands for money with menaces made in the UK  on behalf of Abkco films Inc constitute a breach of section 21 of the Theft Act .

It is common ground that despite the order of the Curt  Mr Pittinger has  deliberately withheld hundreds of The  documents which have not been disclosed. These   include documents in the form of  literally hundreds of record sleeves , record labels ,  CD sleeves , CD discs, DVD VHS sleeves, Laser Disc Sleeves and films .  The plaintiffs   duty to disclose but Mr Pittinger, in order to shield the  personal involvement of Michael Kramer and permit his continued participation in 19-CV-11892 is unconscionable.

As Mr Pittinger is also aware as evidenced  the acknowledgments section of the book Allan Klein by Fred Godman ( appendix 4)   there are 50 hours of taped interviews with Allan Klien  taped interviews and mountains f documents in a New jersey warehouse which have been transcribed but not disclosed to the Curt

 there are hundreds of vital documents which have deliberately not been disclosed to the Court. These documents contain the vital  ℗ (phonographic) © (copyright notices) notices published on record , covers, labels and court settlements which evidence the chain of title and year of

3

first publication in the USA and elsewhere. These documents were ordered to be disclosed and have been deliberately withheld

**MR KRAMER'S INVOLVEMENT IN THE ROLLING STONES ROCK AND ROLL CIRCUS'.**

It is common ground that from 1965 to 1983 Mr Kramer was employed by his uncle Allan Klein as business affairs manager and then general counsel.

It is common ground that Mr Kramer was employed in a business affairs capacity when the five members of Rolling Stones formed a new film making and worldwide film distribution in accordance with the Partnership Act 1890 in combination with a newly formed UK company called Colourtel Productions Ltd ( the Stones/Colourtel partnership) . The result was the production of the infamous illicit UK film *'The Rolling Stones Rock And Roll Circus'.*

It is common ground that *'The Rolling Stones Rock and Roll Circus'* was made in the UK in 1968 in flagrant and knowing violation of the criminal provisions of sections 1(a) and 2(a) the Dramatic and Musical Performers' Protection Act 1958. The reason for this is violation is that '*The Rolling Stones Rock and Roll Circus'* , was illegally made, in the UK in December 1968, solely on the basis of informal verbal agreements with the world-famous musical performers including John Lennon, Eric Clapton and The Who.

It is common ground that The criminal nature of the making of the illicit film in the UK in 1968 stems from the fact that that there were no contracts whatsoever. The film was made on 10th ,11th ,12th December 1968 on the *laissez faire* basis that any of the major international stars who turned up on the day would be filmed and recorded. This action was carried out by Jagger, Richards, and Lieberson in complete and knowing disregard for the law of the UK. The purpose of the criminal act was to circumvent the statutory provisions of of sections 1(a) and 2(a) the Dramatic and Musical Performers' Protection Act 1958

It is common ground that This unlawful act constituted a blatant criminal act in breach of the statutory sections 2(a) the Dramatic and Musical Performers Protection Act as it was a mandatory statutory requirement that the maker of a film must obtain the prior written consent of the performers before they were recorded and filmed .

However, no permissions had been sought from either the managers of the artists or the record labels who lawfully controlled the recording rights of the performers . Crucially, Jagger, Richards and director Lindsay-Hogg , brazenly and knowingly, and with criminal intent, had collectively decided to make ' *The Rolling Stones Rock and Roll Circus'* in breach of sections 1 & 2(a) , and 1&B2 (b) of The Dramatic and UK Musical Performers Act 1958. The outcome of their deliberate criminal efforts was entirely predictable. The result of their calculated criminal actions was the ' *The Rolling Stones Rock and Roll Circus'* by operation of UK law being designated by operation of statutory law as an infringing 'illicit' film.

It is common ground that, from 1968 onwards, by operation of UK law, Both this illicit cinematograph film and its illicit soundtrack could not be lawfully sold, copied, reproduced, shown or broadcast. Accordingly, the film was hastily abandoned in 1968.

Furthermore, it is common ground that the Copyright, Designs and Patents Act 1988 defined the concept of an illicit recording in relation to performances, which covers films (or any video recording) made without consent. Under **Section 197** of the 1988 Act, a recording of a performance (such as a film) is considered an **"illicit recording'**

4

From 1988 onwards the mere possession of the illicit film and *'The Rolling Stones Rock and Roll Circus'* was a criminal offence.

However in 1979 a 7 minute section of the illicit film *' The Rolling Stones Rock and Roll Circus'* was unlawfully given to Who Films Ltd and appeared in the film 'The Kids Are Alright'  © Who Films Ltd.

In 1991 a US corporation controlled and owned by the members of the Rolling Stones released part of *' The Rolling Stones Rock and Roll Circus'* in the documentary film *'25x5 The Continuing adventures of the Rolling Stones'* © Promotour US Inc 1989 (Appendix 5)


The driving force among the makers of the illicit film were Mick Jagger, Keith Richards,  Lindsay-Hogg and Sandford Lieberson. In 1968 They were well  aware that UK Courts  refuse to enforce copyright in works that are  created through illegal means.  This is based on the widely recognised legal  doctrine of *ex turpi causa non oritur actio* meaning "no action can arise from a dishonourable cause". This common law doctrine prevents a claimant from recovering damages or enforcing rights if the claim is based on their own illegal  conduct. It acts as a defence in law to protect the integrity of the legal system, preventing individuals from profiting from their own unlawful activity.

As the film's very existence resulted from a criminal act,  it is contrary to UK  public policy to grant the "maker" of '*The Rolling Stones Rock and Roll Circus'* the benefit of legal protection and access to  remedies for infringement provided by The Copyright Act 1956. could not enforce copyright in the UK courts for the glaringly obvious reason that it is a fundamental legal principle that  equity will not assist a person in profiting from their own wrongdoing. In essence this means that a claimant cannot come to court with unclean hands.

Equity intervenes when the strict application of a rule would be "unconscionable" or unfair. It focuses on conscience and equity. The purpose is  to achieve fair results and prevent injustice. In jurisdictions following the English tradition, if there is a conflict between common law and equity, equity prevails.

It is common ground that in December 1968, the sole activity of the Colourtel /Stones Production Partnership was unlawful and accordingly it was automatically  dissolved in 1968 in accordance with section 34 of the Partnership Act 1890. In consequence *The Rolling Stones Rock and Roll Circus'* all claims to ownership and the right to deal in the illicit film were  therefore dropped like a hot potato.

 In 1974: The 1958 Act remained the primary legislation governing these protections. Because the film was made in contravention of the Act, any commercial sale in 1974 would have constituted a further criminal offence under the same Section 2(b).

 In 1996: By this time, the Copyright, Designs and Patents Act 1988 had replaced the 1958 Act. By this time, the [1988 Act](#) was in full effect. Section 182 and 198 made it a criminal offence to possess or deal with an "illicit recording" in the course of a business. The 1988 act maintained and expanded performers' rights, stipulating that it is an offence to deal with (sell or hire) a recording if the person knows or has reason to believe it is an illicit recording (defined one made without sufficient consent)

An English court in 1995 would not allow a third party to base a copyright ownership claim

5

directly on a 1974 agreement that was "signed in breach of the criminal law." The court would obviously find the agreement was void and unenforceable, preventing the owner from using it as proof of title

In the light of the above and the abrupt notice from Candey Ltd I respectfully request that the Court stays a decision on the motions currently before the court to allow me to file and seek

- i) A motion for full and proper disclosure from Mr Pittinger
- ii) Seek legal advice on my current position
- iii) Replies to my questions to Candey ltd concerning the status of the CFA Agreement
- iv) Provide the Court with written advice I received from Jonathan Fisher QC concerning MCPS Ltd
- v) Provide the Court with the correspondence with PRS /MCPS ltd which began in 2020, before the US proceedings were issued, and which Simon Bourn, Associate General Council at PRS for Music responsible for litigation and compliance matters within the legal team has not disclosed to the Court.
- vi) The Letter Before action from Simkins on behalf of MCPS /PRS which is in the pssesion and control of Simon Bourn


Yours Sincerely

Robert Kirk Carruthers

6

# Appendix 1

---------- Forwarded message ---------
From: **Joshua Ray** <JRay@candey.com>
Date: Sat, 17 Jan 2026 at 17:15
Subject: RE: Letter to Joshua Ray Candey Ltd
To: Robert Carruthers <rkcarruthers@gmail.com>, Joshua Ray <joshua.ray@outertemple.com>

**Dear Bob**

In light of your recent letters and email correspondence that include your allegation that the retainer to act for you is void and various false allegations against me and CANDEY, it is clear that there is now a conflict of interest between CANDEY, myself and you and as a consequence I am unable to represent your best interests.

On that basis I am required by my regulatory duties to cease acting for you and to give you notice that the CANDEY engagement letter governing our relationship will be terminated. Given that we await judgment in the Abkco case and in view of the gravity of the perceived conflict, I consider that it is sufficient to confirm that our representation will terminate as of Monday, i.e., in 48 hours.

I will notify the Court to confirm that I have ceased acting for you and will provide the Court with your contact details for the purpose of receiving the judgment. I would recommend that you take action to immediately engage new lawyers.

**Joshua Ray
Consultant**
DDI: Tel: +44 20 3370 8888

**CANDEY**

LONDON | NEW YORK | BVI

**Litigation Boutique Firm of the Year – The Lawyer Awards 2025 Winner**

www.candey.com

CANDEY Limited, 8 Stone Buildings, Lincoln's Inn, London WC2A 3TA registered in England No.08225765, authorised & regulated by the Solicitors Regulation Authority, No. 614089.
CANDEY (BVI) Limited, Coastal Building, Wickham's Cay II, Road Town, Tortola, British Virgin Islands.
CANDEY LLC, 630 Fifth Avenue, Rockefeller Center, 20th Floor, New York, NY 10111 registered in the state of New York.

# Appendix 2



# Appendix 3



**PG 277 ACKNOWLEDGEMENTS**                                      **Appendix 4**

In 2011, I RECEIVED A CALL from a record executive I had written about, Lyor Cohen. He said Jody Klein, the head of ABKCO Records, wished to meet me. I didn't know Jody, but I certainly recognised ABKCO and understood that he was the son of its founder, the music business lightning rod Allen Klein.

On meeting me, Jody explained that after his father died, two years earlier, the obituaries in the U.S. and abroad, particularly in the British press, had left him in a quandary. "Some of what was said about him was true," he told me. "And a lot it wasn't." Since then, he has been thinking that a more in-depth look at his father's life and career could help sort rumour from fact and illuminate a key period in popular culture and the music business.

His proposal was straightforward: If I was interested in undertaking such a project, he would provide access to personal and corporate records, including correspondence, contracts and documents from the legal and civil cases. There would be no monetary arrangement or quid pro quo: he wasn't looking for a particular result or verdict and would have no editorial control or approval. He just wanted an outsider with a working knowledge of the music business to take a long, hard look at Allen Klein and left the chips fall where they may. When I said the project interested me but the results might not make him happy, it gave him pause, and we shook hands.

**PG 278 ACKNOWLEDGEMENTS**

Jody gave me my own moment of pause when he showed me the skids of documents sitting in a New Jersey warehouse. Allen Klein was obsessive and litigious, He might have been happiest when was plotting legal strategy, and it didn't seem to matter to him whether he was the plaintiff or the target of someone's ire – it was all good, it was all a challenge; it was like p[laying tennis without having to change your clothes or get up from your desk. Sifting through the mountains of records, decoding contracts, and extracting Allen Klein's narrative proved to be heavy lifting and I sometime wondered what I had gotten myself into. But Jody Klein never let me down.

I know Jody loved his father deeply and that reading much of this book cannot be easy. I hope, in the end, that I wrote something that makes that worthwhile.

I also owe a deep debt to Allen's daughter Robin and his wife, Betty, who spoke freely at length with me – sometimes with difficulty, but always with great candour and affection. I hope they see the person they knew in these pages.

The people at ABKCO made me welcome, but I am especially grateful to Maria Papazahariou and Val Collin, who worked most closely with me and who were particularly helpful with locating documents. Their enthusiasm was an enormous encouragement. I also owe a special thank-you to Michael Kramer, who spoke at length and with great feeling about his uncle Allen and his years at ABKCO. Likewise, I am indebted to Andrew Loog Oldham, whose own remarkable story is so closely entwined with the one I set out to tell. In speaking about Allen Klein, Andrew seemed torn, and it was a revelation when I realised the he couldn't decide what was worse: talking about him or not talking about him. Thanks also to Bill Flanagan, a great student of music and its business, for sharing his thoughts and advice.

My publisher and editor, Eamon Dolan, surpassed all expectations. Spending years on a book is like swimming in the ocean: not only can't you see the shore, but you cease to believe it exists. Eamon has been a thoughtful, challenging and patient pilot: I hope he'll let me get him wet again.

PG 280 NOTES

Unless otherwise noted, all quotes attributed to Allen Klein are taken from approximately fifty hours of previously unpublished conversations with music historian Bill Flanagan conducted between October 2000 and August 2003, Which ABKCO recorded, transcribed and made available to the author. Additional unpublished interviews with others who knew and worked with Klein, conducted by Flanagan and Joe McEwen, are specifically credited throughout the book.



Stones is [...] camera to tell their [...] tatingly frank narratives by Mick [...] Charlie Watts, Bill Wyman, and Ron Wood [...] scored by rare interview segments with Brian Jones [...] Mick Taylor, and rare and never-before-seen archival film, video, and newsreel footage.

The early years are captured in vintage live performances on British tv (such as *Ready Steady Go*); American appearances on *The Ed Sullivan Show*, *Shindig* and *Hollywood Palace*; and fan hysteria in the U.S. and Europe. Unreleased scenes from *Rock 'n Roll Circus* and the legendary C**ksucker Blues* also make *25 x 5* indispensible. And there is more: Godard's *One Plus One* (*Sympathy For the Devil*) and the chaos of Altamont (*Gimme Shelter*) are represented; the concert films (*Ladies and Gentlemen, the Rolling Stones* and *Let's Spend the Night Together*); press conferences and business deals; personal glimpses of wives and families; Mick and Keith's feuding and solo projects; induction into the Rock 'n Roll Hall of Fame; and all the tours—from 1964 to 1989.

The soundtrack features nearly 40 songs—starting with "Good Times, Bad Times" and "2120 South Michigan Avenue" from *12 x 5*, climaxing with the making of the *Steel Wheels* album and the complete, unedited version of the "Rock and a Hard Place" video. Executive producer Lorne Michaels (NBC's *Saturday Night Live* and *The Rutles*) and producer Andrew Solt (*This Is Elvis* and *Imagine: John Lennon*) have constructed nothing less than the definitive study of the Rolling Stones.

—Arthur Levy

Executive Producer LORNE MICHAELS   Produced by ANDREW SOLT
Supervising Editor BUD FRIEDGEN, A.C.E.
Supervising Producers JIM SIGNORELLI and GREG SILLS
Co-Producer KEVIN MILLER   Director of Photography RALF BODE, A.C.S.
Directed by NIGEL FINCH



Running Time: 130 minutes
© 1989 Promotour U.S., Inc.

For domestic and home viewing only. All rights of the owners of the works reproduced on this videogram reserved. Public performance or exhibition and copying strictly prohibited. Packaging copyright © 1989 Promotour U.S., Inc. Dolby and the double-D symbol are trademarks of Dolby Laboratories Licensing Corporation.





Suitable o[nly for persons] of 15 yea[rs and over]

